UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION
5:18-cv-00596-D

| | | |
|---|---|---|
| LORETTA MASON, | ) | |
| | ) | **SECOND AMENDED** |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | |
| v. | ) | |
| | ) | |
| BIOMET, INC.,; BIOMET | ) | |
| ORTHOPEDICS, LLC; BIOMET U.S. | ) | |
| RECONSTRUCTION, LLC; and BIOMET | ) | |
| MANUFACTURING, LLC F/K/A | ) | |
| BIOMET MANUFACTURING CORP., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff, LORETTA MASON, residing in Johnson County in the state of North

Carolina, by and through her attorney, brings suit against BIOMET, INC.; BIOMET

ORTHOPEDICS, LLC; BIOMET U.S. RECONSTRUCTION, LLC; and BIOMET

MANUFACTURING, LLC F/K/A BIOMET MANUFACTURING CORP., (hereinafter

collectively referred to as "Defendants" or "Biomet") and alleges as follows:

## INTRODUCTION AND SUMMARY OF ACTIONS

1.      For numerous years, Defendants have known that their hip replacement device, the

M2a-Magnum Hip Replacement System (hereafter, the "Device") is prone to fail years

before its expected life. They have also known that the implant's metal "ball" and

"socket" bearings that make up the hip joint generate metal debris over time from wear

and tear that can spread throughout the patient's surrounding bone and tissue. As a result of these defects, patients that have had the Devices implanted have endured, or will endure, unnecessary pain and suffering; debilitating lack of mobility; inflammation, causing damage or death to surrounding tissue and bone; and a subsequent more difficult revision surgery to replace the faulty devices, giving rise to still more debilitation, a prolonged recovery time, and an increased risk of complications and death from surgery. But rather than recalling the Device upon receiving notice of complaints made to the United States Food and Drug Administration ("FDA") regarding the defects discussed above, or warning physicians and patients of these risks and precautions such as metal level monitoring, Defendants continued to aggressively market the Device, claiming it was a safe and effective hip replacement system. Indeed, Defendants sought to capitalize on the problems with the competitor devices by asserting the superiority of the Device. The Device was approved by the FDA through its 510k approval system which generally means that no testing, including safety testing, was performed before its approval or release. After acquiring knowledge of the complaints the Defendant's refrained from testing the Device and continued to market and sell the Device, misrepresenting its safety and performance in comparison to other products.

2.     Plaintiff's suffering could easily have been prevented. Plaintiff would not have suffered from unnecessary pain and debilitation, as well as the need to undergo subsequent revision surgery, had Defendants taken the affirmative step of recalling the Device, when dozens of complaints began being made to the FDA regarding the Device's failures, or had Defendants at least warned the orthopedic surgical community and the

public of the dangers of the Device so that those who had the Device implanted could be medically monitored for signs of the device malfunctioning including loosening and metal debris related injury. Plaintiff seeks redress for Plaintiff's injuries.

## PARTIES

3.      Plaintiff Loretta Mason resides at 115 Moultrie Ct., Clayton, North Carolina 27527 and is Citizen of North Carolina. She resides in Johnson County, North Carolina, which is within the jurisdiction of the United States District Court for the Eastern District of North Carolina.

4.      Defendant BIOMET, INC., is and at all times relevant to this Complaint was, a citizen of the state of Indiana with its principal place of business in Warsaw, Indiana.

5.      Defendant BIOMET, INC., designed, manufactured, marketed, promoted, and sold the M2a-Magnum Hip System that is the subject of this lawsuit.

6.      Defendant, BIOMET ORTHOPEDICS, LLC, is and at all times relevant to this Complaint was, a wholly owned subsidiary of Defendant BIOMET, INC., an Indiana Corporation with its principal place of business in Warsaw, Indiana.

7.      Defendant, BIOMET, INC., is the sole member of BIOMET ORTHOPEDICS, LLC.

8.      Accordingly, Defendant BIOMET ORTHOPEDICS, LLC, is, and at all times relevant to this Complaint was, a citizen of the state of Indiana.

9.      Defendant, BIOMET ORTHOPEDICS, LLC, designed, manufactured, marketed, promoted, and sold the M2a-Magnum Hip System that is the subject of this lawsuit.

10.     Defendant, BIOMET U.S. RECONSTRUCTION, LLC, is, and at all times relevant to this Complaint was, a wholly owned subsidiary of Defendant, BIOMET, INC., an Indiana Corporation with its principal place of business in Warsaw, Indiana.

11.     Defendant, BIOMET, INC., is the sole member of BIOMET U.S. RECONSTRUCTION, LLC.

12.     Accordingly, Defendant BIOMET U.S. RECONSTRUCTION, LLC, is, and at all times relevant to the Complaint was, a citizen of the state of Indiana.

13.     Defendant, BIOMET U.S. RECONSTRUCTION, LLC, designed, manufactured, marketed, promoted and sold the M2a-Magnum Hip System that is the subject of this lawsuit.

14.     Defendant, BIOMET MANUFACTURING, LLC f/k/a BIOMET MANUFACTURING CORP., is, and at all times relevant to this Complaint was, a wholly owned subsidiary of Defendant BIOMET, INC., an Indiana Corporation with its principle place of business in Warsaw, Indiana.

15.     Defendant, BIOMET, INC., is the sole member of BIOMET MANUFACTURING, LLC f/k/a BIOMET MANUFACTURING CORP.

16.     Accordingly, Defendant BIOMET MANUFACTURING, LLC f/k/a BIOMET MANUFACTURING CORP., is, and at all times relevant to the Complaint was, a citizen of Indiana.

17.     Defendant BIOMET MANUFACTURING, LLC f/k/a BIOMET MANUFACTURING CORP., designed, manufactured, marketed, promoted, and sold the M2a-Magnum Hip System that is the subject of this lawsuit.

18.     At all times relevant herein, Defendants were the agents of each other, and in doing the things alleged herein, each defendant was acting within the course and scope of its agency and was subject to and under the supervision of its codefendants.

19.     Upon information and belief, at all times herein mentioned, the employees of all Defendants, their subsidiaries, affiliates, and other related entities, as well as the employees of the Defendants' subsidiaries, affiliates, and other related entities, were the agents, servants, and employees of Defendants, and at all relevant times, were acting within the purpose and scope of said agency and employment. Whenever reference in this Complaint is made to any act or transaction of Defendants, such allegations shall be deemed to mean that the principals, officers, employees, agents, and/or representatives of the Defendants committed, knew of, performed, authorized, ratified, and/or directed such act or transaction on behalf of Defendants while actively engaged in the scope of their duties.

## **JURISDICTION AND VENUE**

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different States, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this District.

22.     Upon information and belief, Defendants were present and transacted, solicited, and conducted business in North Carolina, through their employees, agents, and/or sales representatives, and derived substantial revenue from such business.

23.     At all times relevant, Defendants placed the defective Device, which was implanted in Plaintiff, into the stream of interstate commerce.

24.     Defendants are conclusively presumed to have been doing business in this state and are subject to North Carolina's long arm jurisdiction.

25.     At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within the United States and the State of North Carolina.

## FACTUAL ALLEGATIONS

**THE DEFENDANTS MANUFACTURED AND MARKETED THE M2A-MAGNUM HIP REPLACEMENT SYSTEM, THE DEVICE, TO THE PUBLIC, EVEN THOUGH THEY KNEW, OR SHOULD HAVE KNOWN, OF THE DANGER THAT THE DEVICE POSED TO THE PUBLIC.**

26.     The Device was developed in order to reconstruct human hip joints that are diseased due to conditions such as osteoarthritis, rheumatoid arthritis, avascular necrosis (AVN), or fracture. The hip joint connects the thigh (femur) bone of a patient's leg to the patient's pelvis. The hip joint is like a ball that fits in a socket. The socket portion of the hip is called the acetabulum. The femoral head at the top of the femur bone rotates within the curved surface of the acetabulum.

27.     A total hip replacement implant device typically consists of four separate components: a femoral stem, a femoral head (or ball), a liner, and an acetabular shell (socket). Usually these components are made of metal and plastic.

28.     The M2a-Magnum Hip Replacement System (Device) does not utilize a plastic liner between the femoral head and acetabular shell. As a result, the Device is referred to by the industry as a Metal-on-Metal (MoM) Implant Device.

29.     These Devices were marketed with the claim that they would last much longer than the conventional hip implant with a polyethylene liner. Indeed, Defendants aggressively marketed the Magnum Device as having many advantages over other hip replacements or hip resurfacing systems.

30.     When initially released, Defendants promoted the Device to surgeons as being "designed specifically to address the issue of wear debris" and held it out as "the right choice for use in young, highly active patients." The M2a produces an exponentially larger number of smaller and more toxic wear particles than wear particles produced from plastic hip implants.

31.     Defendants had actual knowledge by 2000 that heavy metal poisoning is related to the size and total number of these metal particles, as opposed to the total weight of released metal particles. Further, Defendants had actual knowledge that these particles are toxic.

32.     Plastic wear particles released from polyethylene implants are much larger and less reactive than heavy metal wear from metal on metal implants. Testing protocols for wear in polyethylene implants allow for measurement of the wear by total weight.

33. The same protocols, however, explicitly warn against the use of the protocols for measuring wear in metal on metal implants, like the M2a. This is, in large part, because the toxicity and reactivity of heavy metal wear is not related to weight, but particle size and count.

34. Defendants knowingly and intentionally conducted laboratory "wear testing" for the M2a in a way which was only designed for testing of plastic hip implants. Particularly, the test protocols only measured wear by total weight.

35. Defendants were fully aware that the M2a produced more toxic wear than polyethylene implants, regardless of total weight comparisons.

36. Later, Defendants promoted the Device as "offering improved range of motion and joint stability" and employed Olympic gymnast Mary Lou Retton to deliver the message in April 2006 for direct-to-consumer print, TV and radio advertising.

37. Even as other MoM devices came under scrutiny for their high rates of failure over the years, Defendants continued to falsely advertise the Device as a superior and safe device, citing biased and misleading studies and data indicating that the hip replacement was subject to reduced wear and revision.

38. Contrary to what Defendants' marketing campaigns suggest, for many years Defendants have known of the risks inherent in MoM devices, including the M2a Magnum Hip Replacement System. Specifically, for several years, the FDA had been receiving complaints that the Device prematurely failed in some patients, due to component loosening, dislocation, component wear, and fracture, as a result of the design of the Device. In addition, reports were received that the implant's "ball" and "socket" –

which are both metal bearings – generate metal debris over time from normal wear, and this debris can spread throughout the surrounding bone and tissue causing severe inflammation and damage. Defendants had explicit notice in 1995 from one of the world's foremost orthopaedic surgeons that Biomet's protocols for testing its M2a metal on metal hip implants ignored known health risks related to heavy metal poisoning.

39.     Published medical literature existed prior to the marketing of M2a products which explicitly discussed adverse physiologic effects related to heavy metal wear from metal on metal hip implants.

40.     Defendants knew or should have known about the existence of such literature

41.     Biomet affirmatively chose to ignore the existence of such literature because it simply did not agree with the conclusions of such literature.

42.     In conjunction with the promotion of the M2a hip replacements, Biomet hired John Cuckler, M.D., to give speeches and publish articles such as "The Rationale for Metal-on-Metal Total Hip Arthroplasty" published in 2005, claiming that there were "no adverse physiologic effects" to metal on metal hip replacements.

43.     Biomet extensively cited Cuckler's statement in marketing for its M2a products.

44.     Defendants intentionally misrepresented the existence of literature regarding adverse reactions to heavy metal wear in order to market, and profit from the sale of, M2a implants.

45.     Defendants were aware that the British Medicines and Healthcare Products Regulatory Agency (MHRA) and the United States Food and Drug Administration (FDA) expressed concern about Metal-on-Metal hips and the impact of metal ions and

thus Defendants, as part of industry trade groups, participated in discussions of studies of the health effects with other manufacturers during that time period.

46. Since the start of 2006, the FDA received an increasing number of complaints involving patients in the United States that received the Magnum Devices, with a number of these patients requiring complicated, expensive and painful revision surgeries with a prolonged recovery time. Notwithstanding these complaints, Defendants neither halted sales of the Magnum Device nor warned the public. Instead, they continued to aggressively market the Magnum Device as safe and effective, even though they were on notice of the large number of complaints received by the FDA.

47. Defendants' reason to conceal the defect in its M2a-Magnum Hip Replacement System is clear. Hip implant sales are critically important to Defendants. During the time period relevant to this Complaint, Defendants' management was trying to make Defendants look appealing to investors, and in 2007, they were ultimately purchased by a private equity firm for $10 billion. In April 2014, Biomet announced another sale, this time to its competitor Zimmer Holdings, Inc., in a deal valued at $13.35 billion.

48. Defendants were faced with a critical defect in one of their most profitable hip implant systems. Rather than admit that these popular products had a critical defect that could cause a premature failure, forcing patients to have to undergo another painful surgery, Defendants chose to pursue corporate profits, at the expense of patient safety, and continued to promote, market, and sell the Device despite the fact that they knew the product was defective. To this day, Defendants continue to sell these defective implants

to unsuspecting patients without any warning about the risks or the failures that have

been reported to the company.

49.     In 2011, the Australian Orthopaedic Association published its annual report on

data collected from the Australian National Joint Registry, which tracks surgical revisions

of orthopedic devices in Australia (the United States does not have such a registry). The

Report showed that the Device had a yearly cumulative revision rate of 7.2% after seven

years, with a statistical range of 5.3% and 9.7%. This is a much higher revision rate than

some other MoM hip replacements.

50.     In May of 2011, the FDA required Defendants, and other manufacturers, to

provide data on levels of metal in the blood of patients implanted with their MoM hip

implants due to rising concerns regarding their use. The request followed the release of

British studies in March 2010 showing that MoM implants, such as the Device, are

potentially dangerous because they can generate large amounts of metallic debris as they

wear over time. Metallic debris has been shown to cause severe inflammatory responses

in some patients, resulting in pain in the groin, death of tissue in the hip joint, and loss of

surrounding bone. These injuries often require revision surgery to replace the Device

before its expected expiration.

51.     In a systematic review of clinical trials, observational studies, and registries

conducted by the FDA and published in the British Medical Journal on November 14,

2011, it was found that MoM hip implants are no more effective than traditional

polyethylene-lined implants, and increase the risk of revision surgery. Therefore, MoM

hip implants increase the safety risk to patients without providing any benefit over

traditional hip implants. Due to this poor risk-benefit profile, sales of the Device have decreased substantially.

52.     Approximately the same time as Defendants begain selling the M2a, Johnson & Johnson began selling the DePuy ASR.

53.     The DePuy ASR was almost identical to the M2a implants in its primary design features.

54.     Like the M2a, the DePuy ASR was a monoblock metal on metal hip replacement system with its cobalt chromium alloy head articulating against its cobalt chromium alloy shell.

55.     In the summer of 2010, in response to "higher than expected revision rates," Johnson & Johnson conducted a world-wide recall of the DePuy ASR hip replacement.

56.     Johnson & Johnson advised surgeons to conduct detailed testing and follow-up of patients with DePuy ASR hip replacements.

57.     As a result of the testing and follow-up, dangerously high heavy metal levels were discovered in a significant percentage of patients necessitating surgery to remove the metal on metal hip replacements.

58.     Heavy metal poisoning and tissue death from the toxic heavy metals released by the ASR was widely reported in the medical literature.

59.     The Defendants were aware of the reports and studies discussing the injuries suffered by metal-on-metal patients as a result of this very similar product.

60.     In response to the 2010 voluntary world-wide recall of an almost identical hip replacement, Defendants increased promotion of the M2a, attempting to capture market share lost by Johnson & Johnson due to its voluntary recall.

61.     Defendants devices marketing strategies to differentiate the M2a from the recalled ASR hip replacement and other metal on metal hip replacements.

62.     Defendants promoted these marketing strategies to surgeons and the public to reassure them that the M2a did not cause heavy metal poisoning.

63.     As a result of the issues with the Device, recipients of the Device have suffered symptoms including pain, swelling, inflammation, and damage to surrounding bone and tissue, and lack of mobility. As noted above, these symptoms are the result of possible loosening of the implant, where the implant does not stay attached to the bone in the correct position; fracture, where the bone around the implant may have been broken; dislocation, where two parts of the implant that move against each other are no longer aligned; or the spread of metal debris generated from the metal femur head and metal acetabular cup rubbing and rotating against each other. For these reasons, revision surgeries have been necessary to remove the faulty Devices. However, these revision surgeries present enormous risks to patients because they are technically more difficult than the original surgery to implant the Device, the patient is more at risk of complications and death, and the recovery time is prolonged as compared to the original hip replacement surgery.

64.    Defendants knowingly and intentionally spread false information claiming that decades of experience with previous metal on metal implants purportedly resulted in zero instances of heavy metal poisoning.

65.    Defendants engaged in a knowing and intentional scheme to hide clinical information relating to heavy metal poisoning from its own metal on metal hip replacements.

66.    This scheme included explicit training to Biomet's sales representatives on how to deceptively convince surgeons that reports of heavy metal poisoning are all fake; merely a theoretical concern; and a scheme by competitors who do not sell metal on metal hip replacements to steal business.

67.    Biomet Defendants, due to their sales representatives' role in the sale of particular implant components to orthopaedic surgeons, have notice of every surgery in which Biomet components are implanted. This includes surgeries in which Biomet components are used to replace failed M2a implants. As a result, Defendants possess a unique set of clinical information through which the success or failure of their implants can be analyzed.

68.    Unfortunately, Biomet Defendants engage in a corporate practice of under reporting and failing to properly analyze clinical information in its possession regarding implants which it sells.

**AS A DIRECT AND PROXIMATE RESULT OF BIOMET'S FAILURE TO RECALL THE DEVICE, PLAINTIFF WAS IMPLANTED WITH THE DEVICE, AND NOW HAS DEBILITATING PAIN AND REQUIRED REVISION SURGERY TO REPLACE THE DEVICE**

69.     On or about May 22, 2007, Plaintiff underwent a left total hip replacement surgery performed by Dr. Bradley Vaughn at Rex Hospital, Raleigh, North Carolina. Dr. Vaughn implanted a Biomet M2a Magnum metal-on-metal prosthesis. By this time, adverse event reports for the M2a Magnum and other Biomet devices had been filed with the FDA and Biomet knew its product was failing from excessive metal-on-metal wear. Biomet failed to disclose its knowledge to Plaintiff, her physician or the public.

70.     In reliance on Biomet's representations the implant was safe, Dr. Vaughn elected to use Biomet's M2a Device. If Dr. Vaughn had known it was prone to fail with resulting high levels of cobalt and chromium contamination he would not have used it.

71.     As a result of the defective design and manufacture of the Device and its warnings and instructions, Plaintiff's hip implant failed resulting in pain, suffering, disability and revision surgery on May 8, 2015 performed by Dr. Vaughn at Rex Hospital, Raleigh, North Carolina. Pre-surgery testing revealed elevated chromium (6.4 ng/ml) and cobalt (14.5 ng/ml) levels.

72.     Subsequent to surgical recovery and thereafter, Plaintiff suffered symptoms including but not limited to pain, discomfort, soreness, dysfunction, loss of range of motion, and squeaking of the hip joint.

73.     Plaintiff continues to suffer from symptoms including but not limited to increasing pain, discomfort, dysfunction, soreness, and loss of range of motion in her left hip.

74.     An employee and/or agent of Defendants made available the Device to Dr. Vaughn, who implanted the Device on May 22, 2007, the date of the original total hip replacement surgery. Beyond merely providing the Device to the surgeon, agents of Defendants were hired by Defendants to aggressively promote, distribute, and sell the Device.

75.     Directors, managers, and sales representatives of Defendants received training and education from Defendants, including orthopedic and surgical training, product design rationale for the Device, education regarding proper use of the tools to implant the Device, selection of complementary components to the Device, and training on how to sell the Device to surgeons over hip replacements offered by competitors.

76.     On numerous occasions, Defendants met with orthopedic surgeons, including, on information and belief, with Plaintiff's orthopedic surgeon, to promote the M2a Magnum Hip Replacement System. At some or all of these meetings, a representative or representatives of Biomet were present. During these meetings, Biomet assured the orthopedic surgeons, including Plaintiff's orthopedic surgeon, that the M2a Magnum Hip Replacement System was safe, effective, was the best product on the market, had an excellent track record, had very low wear, would last longer than traditional hip implants and had a low and acceptable failure rate. Biomet continued to "defend" the Device even after they became aware of numerous and serious complications with it. Biomet did not reveal (and instead concealed) their knowledge of numerous and serious complications and other "bad data" during their meetings with orthopedic surgeons, including Plaintiff's orthopedic surgeon.

77.    Being implanted with the Device and the subsequent revision surgery have
subjected Plaintiff to much greater risks of future complications than he had before the
revision surgery. For example, several studies have found that a revision surgery causes a
much higher risk of dislocation compared with an original hip replacement surgery. In
one study conducted by Charlotte Phillips and her colleagues at Brigham and Women's
Hospital in Boston, 14.4 percent of patients who underwent a revision surgery suffered
from a dislocation compared with 3.9 percent of patients who underwent an original hip
replacement surgery. In other words, hip replacement patients who have undergone a
revision surgery are four times more likely to suffer from a hip dislocation than those
who have not. (Phillips CB, *et al*. Incidence rates of dislocation, pulmonary embolism,
and deep infection during the first six months after elective total hip replacement.
*American Journal of Bone and Joint Surgery* 2003; 85:20-26.)

78.    Defendants were instrumental in educating Plaintiff's orthopedic surgeon
regarding claimed advantages of the product, addressing the questions of the surgeon, and
sometimes were even present during surgeries, providing technical assistant to the
orthopedic surgeon, and aiding in the selection of instruments and products to be used.

79.    Had Plaintiff or Plaintiff's surgeon known that the Device caused injury and had
the potential to require revision surgery to remove the Device, with no benefit over
traditional hip implants, then neither Plaintiff nor Plaintiff's surgeon would have chosen
the Device for the hip implant surgery. Rather, Plaintiff and Plaintiff's surgeon would
have opted for the safer and more effective traditional hip implant utilizing a
polyethylene liner.

80.     As a direct and proximate result of the implantation of the Device, Plaintiff has suffered significant harm, including but not limited to physical injury and bodily impairment, debilitating lack of mobility, conscious pain and suffering, and loss of earnings. As a result, Plaintiff has sustained and will continue to sustain damages in an amount to be proven at trial.

## FIRST CAUSE OF ACTION
## NEGLIGENCE - DESIGN DEFECT

81.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs, and further alleges as follows:

82.     At all times herein mentioned, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed the Device as hereinabove described that was surgically implanted in Plaintiff. At all times herein mentioned, the Device was in an unsafe, defective, and inherently dangerous condition for users such as Plaintiff that had the device surgically implanted.

83.     The Device was in an unsafe, defective, and inherently dangerous condition at the time it left Defendants' possession.

84.     At all times herein mentioned, the Device was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was designed, produced, manufactured, sold, distributed, and marketed by Defendants.

85.     The Device's unsafe, defective, and inherently dangerous condition was a cause of injury to Plaintiff.

86. The Device failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

87. Plaintiff's injuries resulted from use of the Device that was both intended and reasonably foreseeable by Defendants.

88. At all times herein mentioned, the Device posed a foreseeable risk of danger inherent in the design which greatly outweighed the benefits of that design.

89. At all times herein mentioned, the Device was defective and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by Defendants.

90. At all times herein mentioned, the Defendants knew, or should have known, that the Device was in a defective condition, and was and is inherently dangerous and unsafe.

91. At the time of the implantation of the Device into Plaintiff, the aforesaid product was being used for the purposes and in a manner normally intended, namely for use as a hip replacement device.

92. Defendants, with this knowledge, voluntarily designed their Device in a dangerous condition for use by the public and, in particular, Plaintiff.

93. At all times herein mentioned the Device lacked sufficient utility for any group of users, including Plaintiff.

94. The Devices provided no net benefit to any class of patients, including Plaintiff.

95. Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

96.     Defendants failed to complete adequate pre-market testing and post-market surveillance on the Device.

97.     Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product which, when used in its intended or reasonably foreseeable manner, created an unreasonable risk to the health of consumers and to Plaintiff, in particular, and Defendants are therefore liable for the injuries sustained by Plaintiff.

98.     Defendants are liable for Plaintiff's injuries in the following ways:

    a.  The Device as designed, manufactured, sold, and supplied by the Defendants, was defectively designed and placed into the stream of commerce by Defendants in a defective and unreasonably dangerous condition;

    b.  Defendants failed to properly market, design, manufacture, distribute, supply, and sell the Device;

    c.  Defendants failed to adequately test the Device; and

    d.  A feasible alternative design existed that was capable of preventing Plaintiff's injuries.

99.     As a direct and proximate result of Defendants' placement of the defective Device into the stream of commerce, Plaintiff experienced and/or will experience several harmful effects including but not limited to partial or complete loss of mobility, loss of range of motion, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as additional revision surgeries to replace the Device with the increased risks

of complications and death from such further surgery. Further, as a result of the foregoing acts and omissions, Plaintiff has suffered and/or will in the future suffer lost wages and a diminished capacity to earn wages.

100. Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the safety of recipients of their products, including Plaintiff, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting recipients of Defendants' Device. Defendants' outrageous conduct warrants an award of punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendants jointly and severally for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## NEGLIGENCE - FAILURE TO WARN

101. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

102. Defendants designed, manufactured, tested, marketed, and distributed into the stream of commerce the M2a-Magnum Device.

103. The Device placed into the stream of commerce by Defendants was defective due to inadequate warnings, because Defendants knew or should have known that the Device could fail early in patients and therefore give rise to physical injury, pain and suffering, debilitation, and the need for a revision surgery to replace the device with the attendant

risks of complications and death from such further surgery, but failed to give consumers adequate warning of such risks.

104. The Device is unreasonably dangerous because it was sold to Plaintiff without adequate warnings regarding, *inter alia*, the propensity of the Device to loosen and cause serious pain and necessitate additional surgery, as well as its propensity to generate metal debris resulting in metallosis, increased cobalt and chromium levels, and damage to tissue and bone in patients.

105. Further, the Device placed into the stream of commerce by Defendants was surgically implanted in a manner reasonably anticipated by Defendants.

106. Defendants are liable for Plaintiff's injuries in the following ways:

    a. Defendants failed to warn and place adequate warnings and instructions on the Device; and

    b. Defendants failed to provide timely and adequate post-marketing warnings and instructions after they knew of the risk of injury associated with the use of the Device.

107. As a direct and proximate result of Defendants' placement of the defective Device into the stream of commerce, Plaintiff experienced and/or will experience severe harmful effects including but not limited to partial or complete loss of mobility, loss of range of motion, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as an additional revision surgery to replace the device with the increased risks of complications and death from such further surgery. Further, as a result of the foregoing

acts and omissions, Plaintiff has suffered and/or will in the future suffer lost wages and a

diminished capacity to earn wages.

108.    Defendants' conduct, as described above, was extreme and outrageous.

Defendants risked the safety of recipients of their products, including Plaintiff, with

knowledge of the safety and efficacy problems and suppressed this knowledge from the

general public. Defendants made conscious decisions not to redesign, re-label, warn, or

inform the unsuspecting recipients of Defendants' Device. Defendants' outrageous

conduct warrants an award of punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendants jointly and severally for

compensatory and punitive damages, together with interest, costs of suit, attorneys' fees,

and all such other relief as the Court deems proper.

### THIRD CAUSE OF ACTION
### NEGLIGENCE -  MANUFACTURING DEFECT AND
### FAILURE TO ADHERE TO QUALITY CONTROLS

109.    Plaintiff incorporates by reference, as if fully set forth herein, each and every

allegation set forth in the preceding paragraphs and further alleges as follows:

110.    The Device is defectively manufactured because the foreseeable risks of

mechanical malfunction and failure outweigh the benefits associated with the Device.

111.    The Device was designed and/or manufactured in a manner violative of the

Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 *et seq*., and the Medical Devices

Amendment thereto (hereafter "FDCA"). The facilities or controls used by Defendants in

the manufacture, testing, packaging, storage, or installation of the Device were not in

conformity with applicable requirements of the FDCA.

112. The Device was expected to and did reach the Plaintiff without substantial change or adjustment to its mechanical function.

113. Defendants knew or should have known of the manufacturing defects and the risk of serious bodily injury that exceeded the benefits associated with the Device.

114. Furthermore, the Device and its defects presented an unreasonably dangerous risk beyond what the ordinary consumer would reasonably expect.

115. The Device was defective due to inadequate warnings or instruction because Defendants knew or should have known that the Device created a high risk of bodily injury and serious harm. Defendants failed to adequately and timely warn consumers of this heightened risk which was not obvious, predictable or foreseeable.

116. The Device is inherently dangerous for its intended use due to a manufacturing defect or defects and improper functioning. Defendants are therefore liable to the Plaintiff for their breach of duty to the Plaintiff.

117. As a direct and proximate result of Defendants' wrongful conduct and deviation from its duty, Plaintiff experienced and/or will experience severe harmful effects including but not limited to partial or complete loss of mobility, loss of range of motion, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as an additional revision surgery to replace the device with the increased risks of complications and death from such further surgery. Further, as a result of the foregoing acts and omissions, Plaintiff has suffered and/or will in the future suffer lost wages and a diminished capacity to earn wages.

WHEREFORE, Plaintiff demands judgment against Defendants jointly and severally for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
### NEGLIGENCE

118.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

119.    Defendants had a duty to exercise reasonable care in designing, researching, manufacturing, marketing, supplying, promoting, sale, testing, quality assurance, quality control, and/or distribution of the Device into the stream of commerce, including a duty to assure that the Device would not cause those who had it surgically implanted to suffer adverse harmful effects from it.

120.    Defendants failed to exercise reasonable care in designing, researching, manufacturing, marketing, supplying, promoting, sale, testing, quality assurance, quality control, and/or distribution of the Device into interstate commerce in that Defendants knew or should have known that those individuals that had the Device surgically implanted were at risk for suffering harmful effects from it, including but not limited to, partial or complete loss of mobility, loss of range of motion, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for a revision surgery to replace the Device with the increased risks of complications and death from such further surgery.

121.    The negligence of Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a.  Negligently designing the Device with excessive or inadequate clearance between the "ball" and "socket" components;

b.  Negligently designing the Device in such a way that it produces excessive wear thereby causing metal debris;

c.  Designing, manufacturing, producing, creating, and/or promoting the Device without adequately, sufficiently, or thoroughly testing it, including both pre-market testing and post-market surveillance;

d.  Not conducting sufficient testing programs to determine whether or not the aforesaid Device was safe for use;

e.  Not conducting sufficient testing programs to determine whether or not the Device had optimal and safe clearance;

f.  Selling the Device without making proper and sufficient tests to determine the dangers to its users;

g.  Negligently failing to adequately and correctly warn Plaintiff or Plaintiff's physicians, hospitals, and/or healthcare providers of the dangers of the Device, including:

i.  Negligently failing to warn of an increased risk of metallosis and/or metal poisoning;

ii.  Negligently failing to warn of an increased risk of elevated cobalt and chromium levels;

iii. Negligently failing to warn of an increased risk of premature failure resulting in necessary revision surgery;

iv. Negligently failing to warn of an increased risk of damage to surrounding tissue, bone, and/or nerves;

v. Negligently failing to recall their dangerous and defective Device at the earliest date that it became known that the Device was, in fact, dangerous and defective;

vi. Failing to provide adequate instructions regarding safety precautions to be observed by surgeons who would reasonably and foreseeably implant the Device into their patients;

vii. Negligently advertising and recommending the use of the Device despite the fact that Defendants knew or should have known of its dangerous propensities;

viii. Negligently representing that the Device was safe for use for its intended purpose when, in fact, it was unsafe;

ix. Negligently manufacturing the Device in a manner which was dangerous to those individuals who had it implanted;

x. Negligently designing the Device in a manner which was dangerous to those individuals who had it implanted;

xi. Negligently under-reporting, underestimating, and downplaying the serious dangers associated with the Device;

xii. Failing to use due care in designing and manufacturing the Device so as to ensure optimal clearance and reduce the risk of metal wear and metal debris;

xiii. Failing to accompany their product with proper warnings;

xiv. Failing to accompany their product with proper instructions for use;

xv. Failing to conduct adequate testing, including pre-clinical and clinical testing and post-market surveillance to determine the safety of the Device;

xvi. Otherwise being careless and/or negligent.

122. Despite the fact that Defendants knew or should have known that the Device caused harm to individuals that had the Device surgically implanted, Defendants continued to market, manufacture, distribute, and/or sell the Device.

123. Defendants knew or should have known that consumers such as Plaintiff would suffer foreseeable injury and/or be at increased risk of suffering injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

124. Defendants' negligence was the proximate cause of Plaintiff's physical, mental and emotional injuries and harm, and economic loss which Plaintiff has suffered and/or will continue to suffer.

125. By reason of the foregoing, Plaintiff experienced and will continue to experience severe harmful effects as a result of the Defendants' negligence as set forth above.

126. Further, as a result of the foregoing acts and omissions, Plaintiff has suffered and/or will in the future suffer lost wages and diminished capacity to earn wages.

127. Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the safety of recipients of their product, including Plaintiff, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting recipients of Defendants' Device. Defendants' outrageous conduct warrants an award of punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendants jointly and severally for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION

128. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

129. Defendants supplied false information to the public, to Plaintiff, and to Plaintiff's physicians regarding the quality, safety, and effectiveness of the Device. Defendants provided this false information to induce the public, Plaintiff, and Plaintiff's physicians to purchase and implant a Device.

130. Defendants knew or should have known that the information they supplied regarding the purported high quality, safety, and effectiveness of the implant would

induce Plaintiff and Plaintiff's physicians to purchase and use a Device was false and misleading.

131. Defendants were negligent in obtaining or communicating false information regarding the purported high quality, safety, and effectiveness of the Device.

132. Plaintiff and Plaintiff's physicians relied on the false information supplied by Defendants to Plaintiff's detriment by causing the Device to be purchased and implanted in Plaintiff.

133. Plaintiff and Plaintiff's physicians were justified in their reliance on the false information supplied by Defendants regarding the purported high quality, safety, and effectiveness of the Device.

134. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff experienced and/or will experience significant damages, including but not limited to permanent physical injury, economic loss, pain and suffering, and the need for additional surgeries to repair the physical damage to Plaintiff caused by the Device.

135. Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the safety of recipients of their products, including Plaintiff, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting recipients of Defendants' Device. Defendants' outrageous conduct warrants an award of punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendants jointly and severally for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

<u>SIXTH CAUSE OF ACTION</u>
**VIOLATION OF CONSUMER FRAUD LAW**
**(N.C. GEN. STAT. § 75-1.1 *ET SEQ.*)**

136.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

137.    Defendants are liable to the Plaintiff pursuant to the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. § 75-1.1, et seq.

138.    Defendants unfairly, unconscionably, and deceptively advertised, marketed, sold, and represented the Device as a high-quality, safe, and effective hip replacement system to Plaintiff and Plaintiff's physicians.

139.    Before they advertised, marketed, sold, and represented the Device that was implanted in Plaintiff, Defendants knew or should have known of the unreasonable dangers and serious health risks that such a metal-on-metal total hip replacement system posed to patients like Plaintiff.

140.    Plaintiff purchased and used the Device for personal use and thereby suffered ascertainable losses as a result of Defendants' actions in violation of the consumer protection laws.

141.    Had Defendants not engaged in the deceptive conduct described herein, Plaintiff would not have purchased and/or paid for the Device, and would not have incurred related medical costs and injury.

142.    Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, moneys from Plaintiffs for the Device that would not have been paid had Defendants not engaged in unfair and deceptive conduct.

143.    Unfair methods of competition or deceptive acts or practices that are proscribed by law include the following:

    a.    Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

    b.    Advertising goods or services with the intent not to sell them as advertised; and

    c.    Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding,

144.    Plaintiff was injured by the cumulative and indivisible nature of Defendants' conduct. The cumulative effect of Defendants' conduct directed at patients, physicians, and consumers was to create demand for and sell the Device. Each aspect of Defendants' conduct combined to artificially create sales of the Device.

145.    Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of the Device.

146.    Had Defendants not engaged in the deceptive conduct described above, Plaintiff would not have purchased and/or paid for the Device, and would not have incurred related medical costs.

147.    Defendants' deceptive, unconscionable, or fraudulent representations and material omissions to patients, physicians, and consumers, including Plaintiff, constituted unfair

and deceptive acts and trade practices in violation of the state consumer protection statutes listed.

148.    Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or trade practices in violation of state consumer protection statutes, as listed below.

149.    Defendants have engaged in unfair competition or unfair or deceptive acts or trade practices or have made false representations in violation of the Consumer Fraud Law (N.C. Gen. Stat. § 75-1.1 *et seq.*).

150.    Under the statute listed above to protect consumers against unfair, deceptive, fraudulent, and unconscionable trade and business practices and false advertising, Defendants are the suppliers, manufacturers, advertisers, and sellers, who are subject to liability under such legislation for unfair, deceptive, fraudulent, and unconscionable consumer sales practices.

151.    Defendants violated the statutes that were enacted in these various states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, by knowingly and falsely representing that the Device was fit to be used for the purpose for which it was intended, when in fact the Device was defective and dangerous, and by other acts alleged herein. These representations were made in uniform promotional materials.

152.    The actions and omissions of Defendants alleged herein are uncured or incurable deceptive acts under the statutes enacted in the state to protect consumers against unfair,

deceptive, fraudulent, and unconscionable trade and business practices and false advertising.

153. Defendants had actual knowledge of the defective and dangerous condition of the Device and failed to take any action to cure such defective and dangerous conditions.

154. Plaintiff and the medical community relied upon Defendants' misrepresentations and omissions in determining which hip implant device to use and recommend.

155. Defendants' deceptive, unconscionable or fraudulent representations and material omissions to patients, physicians, and consumers constituted unfair and deceptive acts and practices.

156. By reason of the unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Plaintiff has suffered ascertainable losses and damages.

157. As a direct and proximate result of Defendants' violations of the state's consumer protection laws, Plaintiff has sustained economic losses and other damages and is entitled to statutory and compensatory damages in an amount to be proven at trial.

158. As specifically described in detail above, Defendants' knew that the Device subjected patients to early failure, painful and harmful physical reactions to toxic metallic particles and ions, death of tissue, bone loss, and the need for explants and revision surgery.

159. As a direct and proximate result of Defendants' representations, Plaintiff has experienced and/or will experience significant damages, including but not limited to permanent physical injury, economic loss, pain and suffering, and the need for additional surgeries to repair the physical damage to Plaintiff caused by the Device. Plaintiff is

entitled to recover treble damages from Defendants, pursuant to N.C. Gen. Stat. § 75-16, and to recover reasonable attorneys' fees as provided for in N.C. Gen. Stat. § 75-16.1.

WHEREFORE, Plaintiff demands judgment against Defendants jointly and severally for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

### SEVENTH CAUSE OF ACTION
### PUNITIVE DAMAGES
### (N.C. GEN. STAT. § 1D-1, *ET SEQ.*)

160.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

161.    Defendants' wrongful acts and/or omissions, as described above and herein, were willful and wanton and in conscious and intentional disregard of and indifference to the rights and safety of others.

162.    Defendants misled both the medical community and the public at large, including Plaintiff, by making false representations about the safety and efficacy of the M2a Magnum Device.

163.    Defendant's willful and wanton conduct was motivated by increasing sales and making profits.  The Defendants were aware of the increased risk and likelihood of harm to patients receiving the implant, and particularly Plaintiff and were also aware of other hundreds of cases where harm and injury was caused due to the Device through the complaints filed with the FDA.  The wrongful acts and/or omissions, as described herein, were known by the principal officers, directors, managers, agents and other employees of the Defendants which was allowed, accepted and ratified by them.

164. Defendants risked the safety of recipients of their products, including Plaintiff, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting recipients of Defendants' Device. Defendants' outrageous conduct warrants an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs pray for judgment against Defendants jointly and severally as follows:

1. Economic and non-economic damages in an amount in excess of $75,000 as provided by law and to be supported by the evidence at trial;

2. For compensatory damages according to proof;

3. For treble damages;

4. For punitive damages;

5. For an award of attorneys' fees and costs;

6. For prejudgment interest and the costs of suit; and

7. For such other and further relief as this Court may deem just and proper.

This 12th day of April, 2019.

<div style="margin-left: 40%;">

/s/ Emily J. Beeson
Emily J. Beeson
Egerton & Associates, P.A.
222 Commerce Place
Greensboro, NC 27401
(336) 273-0508 phone
(336) 273-0562 fax
emily@egertonlaw.com
N.C. Bar No. 47567
*Attorney for Plaintiffs*

</div>